# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| TEKNEK, LLC, | ) | Case No.  05 B 27545 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |
| | ) | |
| LAWRENCE FISHER, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06 A 00412 |
| | ) | |
| SHEILA HAMILTON, JONATHAN KENNETT, MARK ROLLINSON, ALAN SANDILANDS, WILL GUTTERIEZ, JERRY WILBERG, TEKENA, USA, LLC, and KENHAM, LLC, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
### on Tekena USA's
### "Motion to Vacate TRO and Appointment of Receiver"

Teknek LLC filed a Chapter 7 bankruptcy case on July 12, 2005, disclosing $73.22 in total assets and total liabilities of $3,788,609.57.  Over ninety-nine percent of these liabilities, or approximately $3,779,000, belongs to a single unsecured judgment creditor, Systems Division, Inc. ("SDI").  The two members of the debtor are C.J. Kennett ("Kennett"), who holds an 85% interest, and Sheila Hamilton ("Hamilton"), who holds the remaining 15%.

After the Chapter 7 trustee retained as special bankruptcy counsel the law firm that had represented SDI in attempting to collect the money judgment, *see* 11 U.S.C. § 327(c), he filed a

1

five-count "Verified Adversary Complaint" on January 19, 2006. The complaint named as

defendants six individuals, including Kennett and Hamilton, and two business entities carrying

on two subsequent versions of the same company, Teknek America/Kenham LLC and Tekena

USA. The other four individual defendants are shareholders of Tekena USA. Count I is by far

the primary concern of this opinion and the motion to vacate at issue herein. It alleges factually

and constructively fraudulent conveyances under 11 U.S.C. § 544(b) and 740 Ill. Comp. Stat.

160/5[1] in the form of Teknek LLC's transfer of its business assets to defendant Teknek

---

[1] Uniform Fraudulent Transfer Act: Transfer or obligation fraudulent as to creditor--Claim arising before or after transfer

§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 Ill. Comp. Stat. 160/5 (2004).

America/Kenham LLC and of large amounts of cash to defendants Kennett and Hamilton;

Tekena USA is alleged to be a subsequent transferee under 11 U.S.C. § 550. Count II requests

that the veils of the American Teknek entities Kennett and Hamilton own be pierced. Count III

alleges that Kennett and Hamilton received wrongful distributions of profit from a limited

liability company within the meaning of 805 Ill. Comp. Stat. 180/25-30 and -35. Count IV

alleges that Kennett and Hamilton breached fiduciary duties to the debtor and its creditors within

the meaning of 805 Ill. Comp. Stat. 180/15-3. Count V alleges that Rollinson, a shareholder of

Tekena USA, has possession of a vehicle to which the debtor Teknek LLC has legal title, thereby

rendering the property subject to an order directing turnover of estate property to the bankruptcy

trustee under 11 U.S.C. § 542.

On the same day, January 19, 2006, the trustee supplemented the complaint with the

"Trustee's Emergency Motion to Appoint Receiver or, in the Alternative, for a Temporary

Restraining Order," which requested the two identified forms of interim equitable relief with

respect to defendant Tekena USA. At the January 23, 2006, hearing on this emergency motion,

the trustee presented exclusively documentary evidence, much of which had been authenticated

by individual defendants Kennett and Hamilton during depositions. At this hearing, five of the

eight defendants – Tekena USA and its four shareholders – appeared in defense by means of a

single attorney after having filed a written response to the emergency motion that same day. At

the conclusion, the Court initially announced entry of a TRO enjoining any transfers over $1000

until 3:00 pm on the following day, January 24, 2006, at which time the Court would enter a

more detailed order granting a TRO and appointing a receiver. On January 24, 2006, the Court

entered "Corrected Preliminary Findings in Support of a Receivership and a Conditional

3

Temporary Restraining Order." The TRO froze assets only in the event that Kennett and

Hamilton terminated a certain distributorship license but otherwise permitted ordinary-course

business activity as long as full market value in goods or services was received for all asset

transfers. The ruling further appointed attorney Jay Steinberg as the receiver but did not order

him to take possession and control of the business operation. Instead, a receiver with limited

scope was ordered to oversee all receipts and disbursements to ensure that fair market value be

received for all transfers of money or property and to generally monitor Tekena USA's financial

relationship with the debtor Teknek LLC and defendant Teknek America/Kenham LLC. The

Court continued the trustee's emergency motion to February 2, 2006, to tie up open issues

concerning the receivership, including the applicant's bond requirements, and it entered two

orders resolving these issues at the continued hearing: a "Supplemental Order for the

Appointment of a Receiver" and an order finding cause to dispense with the applicant's duty to

submit a bond. The Court did not explicitly convert the TRO into a preliminary injunction, as

the issues concerning the receivership dominated the continued hearing.

All of the substantive issues concerning both the TRO and the receivership returned when

Tekena USA and its four shareholders filed a "Motion to Vacate TRO and Appointment of

Receiver," on which the Court heard argument at a February 21, 2006, hearing. At the

conclusion of the hearing, the Court took all issues raised under advisement after announcing that

the TRO was vacated effective the same day. Procedurally, this opinion is a ruling on the motion

to vacate its orders granting preliminary equitable relief on the Chapter 7 trustee's emergency

motion in the adversary proceeding. To date, only Tekena USA and its four shareholders have

appeared to oppose the two forms of preliminary relief, although the nature of this adversary

4

proceeding is such that any finding of a likelihood of success on Count 1 would require findings

of probable success against defendants Kennett, Hamilton, and/or Teknek America/Kenham

LLC. Though these last three have not appeared in opposition to the requested preliminary

equitable relief, they have filed or plan to file motions to dismiss the underlying complaint.

### A. Amended Preliminary Findings
### Pertaining to the TRO and Creation of an Equity Receiver
### and to Background Factual Information

Teknek LLC filed a Chapter 7 bankruptcy case on July 12, 2005, disclosing $73.22 in

total assets and total liabilities of $3,788,609.57. Over ninety-nine percent of these liabilities, or

approximately $3,779,000, belongs to a single unsecured judgment creditor, Systems Division,

Inc.

The Chapter 7 debtor Teknek LLC and two of the adversary-proceeding defendants,

Teknek America/Kenham LLC and Tekena USA, were each, at some point in time, U.S.

distributors for a Scottish company once known as Teknek Electronics and then known, after

foreign insolvency proceedings, as Teknek Holdings. These various "Teknek" companies do not

have parent-subsidiary relationships; these companies are separately owned by defendant

members/shareholders Kennett and Hamilton – with the notable exception of the movant in the

instant motion to vacate, Tekena USA. Hamilton, as vice president, owns 15% of each U.S.

"Teknek" entity, while Kennett, as president, owns 85% of each. Defendants Hamilton and

Kennett formed the debtor Teknek LLC in 1996 to sell the circuitry boards, cleaning devices, and

other products of the Scottish concern Teknek Electronics in the United States. The

distributorship operation at issue in this adversary proceeding has been formally owned in

successive order by the Chapter 7 debtor Teknek LLC, then by Teknek Electronics in Scotland,

then by defendant Teknek America/Kenham LLC, and finally by defendant Tekena USA.

In 1999, the lone noninsider creditor of this bankruptcy estate, SDI, sued the debtor and the Scottish concern, Teknek Electronics, in a federal district court in California for infringement of its patent rights. After obtaining a jury verdict in its favor on July 12, 2004, SDI was granted a money judgment now worth in excess of $3.7 million on August 18, 2004; the money judgment was affirmed on appeal. On March 25, 2005, SDI registered the judgment from the original federal district court with the U.S. District Court for the Northern District of Illinois, *see* 28 U.S.C. § 1963, and attempted to collect on the same in Illinois where the debtor's operation base is located. In the federal collection suit, U.S. District Court Judge Shadur entered a June 2, 2005, order finding Kennett and Hamilton and Teknek America/Kenham LLC in civil contempt of court for disobeying the order of the federal district court judge presiding over the patent-infringement suit in California. As a result of this finding, U.S. District Court Judge Shadur enjoined Teknek America/Kenham LLC from trading in the United States, a move Kennett admitted was a prompt for Teknek LLC's Chapter 7 filing. Four days later, Judge Shadur denied an emergency motion to stay enforcement of the June 2 ruling without prejudice. On June 29, 2005, Teknek America/Kenham LLC filed another emergency motion to stay or modify the June 2 ruling, while SDI filed a July 5, 2005, motion to have Kennett, Hamilton, and Teknek America/Kenham LLC declared in further contempt of the June 2 ruling. The Chapter 7 filing of debtor Teknek LLC followed these two pending countermotions on July 12, 2005. The bankruptcy filing may have caused Judge Shadur to vacate the June 2 injunction effective July 15, 2005, which mooted Teknek America/Kenham LLC's motion to stay or modify the June 2 ruling. Judge Shadur also denied without prejudice the motion to hold Teknek America/Kenham

LLC, Kennett, and Hamilton in contempt of court for their conduct during the injunction's span from June 2, 2005, to July 15, 2005.

The first set of comprehensive transfers away from the debtor coincided with the impending jury-trial verdict in 2004, beginning in earnest during the fiscal year ending May 31, 2004. These transfers had two primary results: 1) defendants Kennett and Hamilton aggregately received $722,967 in profit distributions and returns of capital, and 2) the tangible and intangible business assets passed from the debtor to Teknek Electronics in Scotland and then back to the U.S. defendant herein, Teknek America/Kenham LLC.

For the fiscal year of 2003 and prior to paying Kennett and Hamilton the $722,967, the debtor began taking business-expense deductions from income for "intercompany services fees" paid to an overseas Teknek company in the amount of $400,000, though certain corresponding financial statements did not show the same intercompany payments. Then on January 12, 2004, Kennett and Hamilton anticipated and justified the facial "reorganization" by concluding that the debtor Teknek LLC was suffering from the post-September 11 recession and that it needed the name "America" in the company title. For the fiscal year ending May 31, 2004, however, the debtor grossed around $4,219,817 in sales, leaving over $457,829 in net income. Income tax documents reveal that prior to "going out of business," Kennett and Hamilton transferred to themselves more than the net-income amount in nonpayroll, LLC-member distributions and returns of capital. *After* going out of business, the transfers to Kennett and Hamilton interests did not cease. The debtor held two accounts at U.S. Bank: one with a local address and one with a Scottish address. As of September and October 2004, three and four months after the debtor went out of business in June 2004, substantial funds traveled from the locally addressed debtor's

7

account to another debtor's account addressed abroad and finally to a nondebtor bank account in

Scotland controlled by defendant Kennett. The September 2004 transfer was for approximately

$200,000, while the October 2004 transfer was for approximately $107,000.

The business assets themselves took a different route. The debtor first transferred them to

Teknek Electronics in Scotland, allegedly in repayment of an intercompany loan for

approximately $1 million, and then Teknek Electronics transferred the same to the defendant

Teknek America/Kenham LLC for no consideration in June 2004. Although this intercompany

loan from Scottish Teknek Electronics pertained to start-up costs from 1996, the loan did not

appear in the debtor's books until 2000, at which time Kennett and Hamilton suddenly recorded

the loan with no corresponding record of an increase in cash. At a deposition, Kennett gave

inconsistent answers regarding the initial purpose of the loan, stating both that the loan was pay

for start-up expenses in 1996 and that the loan pertained to a time in 1999 that would not have

corresponded with starting the business. The existence of the loan as a justification for the asset

transfer is dubious in light of other evidence, as well. At the time the debtor ceased business

operations in June 2004 by transferring its business assets to the Scottish concern, one version of

the debtor's own balance sheet showed that the Scottish concern owed the debtor roughly

460,000 pounds, not vice versa. Although the balance of the loan for which the debtor's business

assets provided satisfaction was roughly half a million dollars, and although the debtor had been

netting roughly the same amount in profit *each year*, Kennett and Hamilton had the debtor and

Teknek Electronics perform an even swap without any supporting third-party valuation of the

business enterprise to ensure that the debtor's noninsider creditors were not shortchanged.

Transferee Teknek America/Kenham LLC continued the same operation beginning in June 2004

with similar levels of profitability, including up to $7 million in gross revenue, subleasing from the now-defunct Teknek Electronics a venue several blocks from the debtor's business base, which had also been subleased from Teknek Electronics. This defendant served many of the same customers; used the same website, furniture, equipment, employees, and bank accounts; and negotiated checks payable to the debtor. The *debtor* continued to pay the salaries of Teknek America/Kenham LLC's employees for six months after the debtor ceased operations in May 2004, though the employees rendered these services for defendant Teknek America/Kenham LLC and not for the benefit of the debtor. Other evidence further established the lack of a bona fide, nonfraudulent purpose for the "reorganization" of the debtor into Teknek America/Kenham LLC. Kennett and Hamilton initially planned the reorganization in January 2004, with the distributorship license set to terminate at the end of May 2004. Yet on May 4, 2004, a check was drawn on the debtor's account for future exhibition space that the debtor could never utilize; the space would benefit the successor company Teknek America/Kenham LLC.

Based on the totality of this information, the Court finds that on Count I the trustee has a probability of success in establishing that the money and assets ending up in the hands of defendants Hamilton, Kennett, and Teknek America/Kenham LLC are recoverable as both factually and constructively fraudulent conveyances with respect to the single unsecured judgment creditor, SDI. The debtor likely had an intent to hinder, delay, or defraud SDI. Moreover, the transfer of the business assets was likely in exchange for less than reasonably equivalent if the questionably late entry of loans from Teknek Electronics does not hold up. The monetary transfers to Kennett and Hamilton would also be constructively fraudulent, having been in return for less than reasonably equivalent value. The distribution of assets of a business entity

9

to one of its equity interest holders "without adequate consideration" is deemed constructively fraudulent as to unpaid creditors without regard to actual intent. *Blocker v. Drain Line Sewer & Water Co.*, 282 N.E.2d 207, 209 (Ill. App. Ct. 1972). Similarly, a distribution of profits or dividends to L.L.C. members that is not compensation or salary for services rendered is not a transfer in exchange for reasonably equivalent value under the Uniform Fraudulent Transfer Act. *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 267-68 (Bankr. N.D. Tex. 2003).

For some of these transfers, a nonparty in Scotland, Teknek Electronics, would be the "initial transferee" under 11 U.S.C. § 550(a)(1), making Teknek America/Kenham LLC an "immediate transferee" with a potential affirmative defense under § 550(b).[2] Because this affirmative defense requires both good faith and lack of knowledge of voidability, and also because the intent of the *transferor* debtor (i.e., Kennett and Hamilton) is nearly identical to the intent of the *transferee* defendant Teknek America/Kenham LLC, this probability of success against the transferee defendant exists in spite of the good-faith affirmative defense in § 550(b). This conclusion is in accord with the underlying Illinois fraudulent conveyance law: When a debtor/transferor and a transferee are each controlled by the same shareholder who is also a dual-purpose director, officer, and/or manager, the intent of the individual officer/shareholder to

---

[2]

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from--
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a)-(b).

hinder, delay, or defraud is imputed to both business entities: the debtor/transferor and the

transferee. *Sherwin-Williams Co. v. Watson Industries*, 198 N.E. 704, 706-07 (Ill. 1935).

The second set of continuing comprehensive transfers away from the debtor (and third

transfer overall) occurred about two months after Teknek LLC filed for Chapter 7 relief, on

September 13, 2005. The defendant Teknek America/Kenham LLC entered into an asset

purchase agreement with a new company, Tekena USA, formed on June 22, 2005, and owned by

Teknek America/Kenham LLC's employees (and the debtor's former employees). The timing of

this third company's emergence corresponds to the period during which U.S. District Court

Judge Shadur held defendant Teknek America/Kenham LLC in contempt of court and enjoined it

from operating as part of SDI's money-judgment-collection suit in Illinois. For $38,500, the

September 2005 asset purchase agreement permitted the American operatives of the company to

distribute Teknek products obtained from unidentified third parties. In addition to buying the

inventory rights under a consignment agreement, customer lists, executory contracts, business

correspondence, books, records, payroll data, and brochures of the Teknek America business,

Tekena USA assumed the rights and liabilities of Teknek America/Kenham LLC under three

subleases from sublessor Teknek Holdings for real property and for certain equipment, furniture,

and fixtures.[3] Tekena USA obtained the distributor's license its predecessor held from Teknek

Manufacturing, Ltd. It further obtained the license to the use of the trade name Teknek America,

which is the reason that defendant Teknek America/Kenham LLC began use of the trade name

Kenham LLC. Kennett and Hamilton's Scottish distributor license holder can terminate the

---

[3]Tekena USA did not purchase defendant Teknek America/Kenham LLC's accounts receivable, cash, and certain deposit accounts. Teknek America/Kenham LLC continued in existence to collect the receivables.

license at will on thirty days' notice, which is the purported reason that an enterprise netting a

half million in profit is supposedly only worth $38,500. The Court finds preliminarily that those

who controlled defendant Teknek America/Kenham LLC (defendants Kennett and Hamilton) had

the same intent to hinder and delay creditors as under the first set of comprehensive transfers.

Therefore, when it executed its asset purchase agreement with defendant Tekena USA, the

transferor Teknek America/Kenham LLC likely engaged in another factually fraudulent transfer

that would further cloud the good faith required for both a complete affirmative defense under §

550(b) and a partial affirmative defense under § 550(e).[4] (Defendant Tekena USA's possible

liability as a *transferee* under 11 U.S.C. § 550(a)-(b) is discussed *infra*.)

The entanglement of the three successive entities at issue cannot be overemphasized. By

and large these three have used the same distributor agreements from the Scottish version of

"Teknek," the same banks, the same websites or family of website links, the same customer

account numbers, and the same exhibition space at trade shows. The four workers who actually

operate the business of distributing Teknek products in the United States have been the same

throughout the life of the three entities (individual defendants Rollinson, Sandilands, Gutteriez,

---

[4]

(e)(1) A good faith transferee from whom the trustee may recover under subsection (a) of this
section has a lien on the property recovered to secure the lesser of--
(A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any
profit realized by or accruing to such transferee from such property; and
(B) any increase in the value of such property as a result of such improvement, of the property
transferred.
(2) In this subsection, "improvement" includes--
(A) physical additions or changes to the property transferred;
(B) repairs to such property;
(C) payment of any tax on such property;
(D) payment of any debt secured by a lien on such property that is superior or equal to the rights of
the trustee; and
(E) preservation of such property.

11 U.S.C. § 550.

and Wilberg) though they now own the operation.[5] Rollinson's history with the "Teknek" enterprise stretches back even further, having emigrated from the United Kingdom where he worked for a different "Teknek" entity. The debtor Teknek LLC continued to pay the salaries of its employees for six months after it ceased operations in June 2004, though the employees rendered these services for defendant Teknek America/Kenham LLC and not for the benefit of the debtor. The local bank accounts of the three entities at issue have a rather confusing entanglement. The debtor's bank statements for the two months following the debtor's Chapter 7 filing, for August and September 2005, have been addressed and sent to Tekena USA, an entity which is supposedly "unrelated" to the two entities Kennett and Hamilton own. These postpetition bank statements show customers of the debtor wiring at least four transfers of funds to a bank account registered as the Chapter 7 debtor's account, though such accounts have not been disclosed in the bankruptcy schedules. Additionally, the debtor drew a check in the amount of $3790 on one of these undisclosed bank accounts seven days after its Chapter 7 filing. These funds were eventually transferred to another local account at U.S. Bank where they were subject to the control of a Teknek CFO in Scotland who was not an employee or officer of the debtor but

---

[5] At this point, no factual allegations in the complaint and no counts have alleged anything that would indicate that the corporate veil of Tekena USA could or should be pierced as a result of these four individuals' failure to observe corporate formalities and intent to defraud creditors. For three of these individual defendants (Sandilands, Gutteriez, and Wilberg), the trustee's basis for their inclusion is unclear. For individual defendant Rollinson, Count V appropriately lies against him, because the allegation is that he personally has possession and use of a vehicle to which the Chapter 7 debtor's bankruptcy estate holds legal title, thereby rendering such vehicle vulnerable to an action for turnover of estate property pursuant to 11 U.S.C. § 542. The receivership at issue in this opinion is based on the trustee's likelihood of success on Count I of the adversary complaint.

In contrast, the complaint does adequately call into issue whether defendants Kennett and Hamilton are entitled to the protection of the veils of the debtor Teknek LLC and defendant Teknek America/Kenham LLC. Limited liability companies may be subjected to veil-piercing actions in a way similar to the way corporations are deemed alter egos of their shareholders. *GMAC Commercial Mortg. Corp. v. Gleichman*, 84 F.Supp.2d 127, 140 (D. Me. 1999); *In re Securities Investor Protection Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768, 775-77 (Bankr. N.D. Ill. 2002).

who answered to defendants Kennett's and Hamilton's other companies. These uses of the debtor's bank accounts occurred not only after it purported to cease business operations in June 2004 but also after it filed for Chapter 7 relief on July 12, 2005, without disclosing such legal interests.

Tekena's entanglement in this enterprise, though highly disputed and not as obvious as that between the debtor and defendant Teknek America/Kenham LLC, is nonetheless present to a significant degree. A year and a half after the debtor went out of business, "Teknek" customers continued drawing postpetition checks specifically payable to the debtor, which checks Tekena USA negotiated in payment of product invoices that Tekena USA issued. This demonstrates that customers never really understood that they were dealing with different companies, and the "Teknek" companies themselves, if viewed as discrete entities, likewise never really cared about commingling and misidentification. Also, a mere seven days before the asset-purchase-agreement transfer from defendant Teknek America/Kenham LLC to defendant Tekena USA, defendant Teknek America/Kenham LLC paid $3,540 for exhibition space at a September 2006 event – space Teknek America/Kenham LLC itself would never see nor utilize. This is not rational business conduct unless the underlying financial interests never substantially changed. Finally, when Teknek America/Kenham LLC sold the business to Tekena USA, the selling entity and Kennett and Hamilton retained and informed an appraiser who valued the enterprise at $38,500, which Tekena USA, through the four former employees, readily agreed to pay. Although in a typical arm's-length transaction a buyer would not be inclined to rely solely on the *seller's* appraisal, the buyer in this case, having rather close ties to the seller, did so. The effect of the transaction and related license-termination provision is to have a entity probably liable

14

under § 550(a) transfer a valuable *res* after having put a dent or scratch on such *res*, yet the dent

or scratch may or may not be trivial enough to prevent the new users from enjoying the *res* to the

same extent the affiliated judgment debtor did before. In other words, an ultimate issue

surrounding the adequacy of the $38,500 in exchange for the American component of the Teknek

enterprise is whether this termination provision is bona fide. For instance, if a sale is not at arms'

length and the seller subjectively intends to never enforce a license-termination provision, such

provision really has nothing to do with the fair market value of the asset transferred. It must also

be noted that even if the profits of Tekena USA are going to shareholders/former employees who

are not liable for the SDI judgment, funds that Tekena USA pays out for business expenses such

as inventory do find themselves back in the pockets of the Scottish distributor Teknek Holdings

in the form of profits on wholesale inventory sales. This latter detail could be rather crucial,

because it serves to explain the described, otherwise-irrational business conduct in such a way

that it lends support to a key issue under the § 544(b) cause of action. If Tekena USA and its

new owners took over the U.S. distributorship, Kennett and Hamilton could still benefit from

"Teknek" goodwill and generate at least some limited profit from wholesale inventory sales in

the U.S. market, even if not the first layer of retail profits, while simultaneously avoiding

payment of the patent-infringement judgment against the debtor. Viewed in this way, defendant

Teknek America/Kenham LLC likely had an intent to hinder, delay, or defraud a creditor when it

transferred business assets to defendant Tekena USA in September 2005.

### B. Legal Discussion and Analysis of Tekena USA's Motion to Vacate

A motion filed within 10 days of the entry of an order alleging error will be construed as a

"Motion to Alter or Amend Judgment" within the purview of Bankruptcy Rule 9023 and, by

15

incorporation, Federal Rule of Civil Procedure 59(e).[6] The grounds for granting a Rule 59

motion for reconsideration and amendment of an order or judgment are similar to those required

for amending factual and legal findings under Federal Rule 52(b) (and Bankruptcy Rule 7052).

Those grounds include (1) an intervening change in the law, (2) newly discovered evidence that

in all fairness could not have been presented or could not have been anticipated as being relevant

at the time of trial, (3) any manifest error of fact or law, and (4) lack of notice. *See Cosgrove v.

Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998); *Matter of Prince*, 85 F.3d 314, 324-25 (7th Cir.

1996); *Publishers Resource, Inc. v. Walker-Davis Publications*, 762 F.2d 557, 561 (7th Cir.

1985); *Spirk v. Sullivan*, 2003 WL 22048077, at *7 (N.D. Ill. 2003); *In re Brogden*, 274 B.R.

287, 293-94 (Bankr. M.D. Tenn. 2001); *cf. Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207,

1219 (5th Cir. 1986) (same for Rule 52(b) motion to amend factual findings).  If the ground

asserted is that the judgment was based on a manifest error of fact or law, the alleged error must

relate to evidence and legal arguments that were already part of the record and pleadings leading

to the disputed order or judgment. *See Prince*, 85 F.3d at 324; *Fontenot*, 791 F.2d at 1219-20.

The movant cannot present new legal theories (other than ones based on an intervening change of

law) or new evidence (other than evidence that could not have been discovered in time for trial).

*See Walker-Davis*, 762 F.2d at 559, 561; *Fontenot*, 791 F.2d at 1219-20; *Spirk*, 2003 WL

---

[6]

Any motion that draws into question the correctness of the judgment is functionally a motion under
Rule 9023, whatever its label. Thus a motion to 'reconsider,' 'for clarification,' to 'vacate,' to 'set
aside' or to 'reargue' is a motion under Rule 9023, and under Bankruptcy Rule 8002(b) will
postpone the time for appeal if the motion was timely made.

It has also been held that a motion for reconsideration is to be treated as a motion under Rule 9023,
rather than, for example, a motion under Rule 9024 . . . , since it draws into issue the correctness of
the trial court's decision.

10 Lawrence P. King et al., *Collier On Bankruptcy* ¶ 9023.04, at 9023-6 (15th ed. rev. 2004).

22048077, at *7.

Five of the eight defendants directly associated with the receivership previously ordered in this adversary proceeding – Tekena USA and shareholders Rollinson, Sandilands, Gutteriez, and Wilberg – assert that the Court committed legal error in justifying the receivership by applying facts pertaining to the alleged misdeeds of the other three defendants to Tekena USA, which has separate ownership and control from the Chapter 7 debtor and from defendant Teknek America/Kenham LLC. Tekena also asserts that appointment of an Illinois receivership is a "noncore proceeding" that is merely "related to" the bankruptcy case in chief, *see* 28 U.S.C. § 157(c) & § 1334(a)-(b), because all aspects of such appointment, including the legal standards for initiating the same and for regulating its future course, are governed by Illinois law. Because the isolated receivership controversy does not depend on Title 11 of the U.S. Code for its existence, it supposedly does not "arise under" Title 11 or "arise in" a case under Title 11. As this contention involves subject matter jurisdiction, we begin with it.

## C. The Relationship Between Prejudgment Remedies Under Bankruptcy Rule 7064 and Core/Noncore Subject Matter Jurisdiction in Bankruptcy

Unlike the defendants' view, the law requires a more comprehensive analysis with a broader view of how a state-law receivership fits into the framework of a Title 11 case. To begin, the Bankruptcy Code states, "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). As various authorities have recognized, many types of litigation resolving causes of action and motions originating under the Bankruptcy Code encompass subsets of issues resolved under applicable state law. *E.g., In re Marchiando*, 13 F.3d 1115-16 (7th Cir. 1994); *O'Shea v.*

17

*Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000); *Johnson v. Woldman*, 158 B.R. 992,

995-96 (N.D. Ill. 1993), *affirmed*; 92 F.3d 546, 547 (7th Cir. 1996). They are nonetheless core

matters. *Collier on Bankruptcy* has clarified this principal:

> *Marathon* was thought by some to have held that bankruptcy courts cannot
> constitutionally hear any controversy that is based upon state law, an
> interpretation that would have made nontenured judges incapable of rendering
> dispositive orders in almost any dispute arising during a bankruptcy case.
> Objections to claims almost always involve state law. Illustrations of this concept
> can be multiplied *ad infinitum*, and would even include avoidance actions, since
> the defenses contained in sections 547 and 548 deal, among other things, with
> when a transfer was perfected, which invariably involves a resort to state law to
> determine when a transfer is perfected against a lien creditor or bona fide
> purchaser, as the case may be.
> Instead, section 157(b)(3) restricts the use of a state-law rationale as a device to
> have a particular civil proceeding characterized as related. **The nature or source
> of the cause of action, not the governing substantive law, is to be
> determinative.**

1 *Collier On Bankruptcy* ¶ 3.02[6][a], at 3-50.1 (Alan N. Resnick & Henry J. Sommer eds., 15th

ed. rev. 2004) (emphasis added). Count I in this adversary proceeding – the only one implicating

defendant Tekena USA and the four other individual defendants pursuing the motion to vacate –

is a civil proceeding to avoid a fraudulent conveyance under 11 U.S.C. § 544(b) by having the

trustee step into the shoes of an allowed unsecured creditor who could have avoided transfers

under state law. Because this special cause of action is defined in the first instance by Title 11, it

is, therefore, a "core proceeding" under 28 U.S.C. § 157(b)(2)(H). *See In re Mankin*, 823 F.2d

1296, 1299-1300 (9th Cir. 1987). In core civil proceedings (and in civil suits litigated anywhere),

the court determines whether a defendant is ultimately liable under a particular legal theory, and

then if the court finds liability on the claim, the court decides the appropriate remedy, depending

in part on what remedies the plaintiff has requested. Here, for instance, 11 U.S.C. § 550 governs

who is liable for the ultimate *receipt* of a fraudulent transfer avoided under § 544(b) and also how that party is liable. A bankruptcy court most assuredly does not split the claim and the remedy into separate inquiries of subject matter jurisdiction; it makes a single determination based on the nature of the claim. A *prejudgment* remedy is nothing more than a device a court uses to preserve its ability to ultimately fashion some sort of meaningful relief, *e.g., Hurst v. Papierz*, 306 N.E.2d 532, 538 (Ill. App. Ct. 1973); it is not the reason for the lawsuit's existence or the court's initial jurisdiction. Viewed in this way, any prejudgment remedy under Bankruptcy Rule 7064 is part and parcel of the cause of action stated in the count to which the prejudgment remedy pertains, a count which in this case is a core proceeding. Illinois itself agrees on this point, having declared, "'That the general rule is, that the appointment of receivers is an ancillary remedy in aid of the primary object of litigation between the parties, and such relief must be germane to the principal suit; . . . a suit cannot be maintained under this general rule where the appointment of a receiver is the sole primary object of the suit and no cause of action or ground for equitable relief otherwise is stated.'" *Davis v. Alton, J. & P. Ry. Co.*, 180 Ill.App. 1, 1913 WL 2346, at \*5 (Ill. App. Ct. 1913) (quoting Cyc. vol. 34, p. 29); *see also First Federal Sav. and Loan Ass'n of Chicago v. National Boulevard Bank of Chicago*, 433 N.E.2d 1036, 1038 (Ill. App. Ct. 1982). With this principal in mind, we can see that by using 11 U.S.C. § 105(a) and Bankruptcy Rule 7064 in conjunction, a bankruptcy court need not sit around and wait for defendants to stymie its ability to eventually fashion meaningful relief in a "core" civil proceeding, including actions under sections 544 and 550. *Cf. In re Schlein*, 178 B.R. 82, 86 (Bankr. E.D. Pa. 1995) (using only § 105(a) and federal law to create a receivership to protect the bankruptcy estate's partial interest in a partnership that was not a bankruptcy debtor). All

19

interlocutory and final orders subsumed within a bankruptcy court's adjudication of a

count/claim that otherwise presents a core matter are orders issued pursuant to core subject

matter jurisdiction.[7]

In re Memorial Estates, 797 F.2d 516, 518 (7th Cir. 1986), does not require a different

conclusion. First, neither of the two issues actually presented and decided on appeal concerned

the type of subject matter jurisdiction of the bankruptcy court;[8] the Seventh Circuit merely

commented on why the district court judge entered the final order and not the bankruptcy court

judge. The conclusion was thus *dicta.* Second, the conclusion that 28 U.S.C. § 157(c) applied

was not supported by any analysis or authority. Several of the explicit categories of core

proceedings listed in § 157(b)(2), used separately or in conjunction, could have supported the

conclusion that the removed foreclosure action was in fact a core civil proceeding in bankruptcy:

"(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the

debtor-creditor . . . relationship;" "(N) orders approving the sale of property;" "(M) orders

approving the use . . . of property;" "(K) determinations of the validity, extent, or priority of

liens;" and "(B) allowance or disallowance of claims against the estate." The court discussed

none of these "core" categories singularly or in conjunction with one another. Finally, and most

importantly, *Memorial Estates* is distinguishable even if it meant what the defendants assert.

---

[7]The Court is not addressing whether appointment of an equity receiver is immediately appealable under 28 U.S.C. § 158(a); it only addresses whether it must propose findings of fact and conclusions of law to the U.S. District Court for the Northern District of Illinois for its recommended adoption pursuant to 28 U.S.C. § 157(c)(1).

[8]The first issue decided was whether a nonfinal order appointing an equity receiver was appealable pursuant to 28 U.S.C. § 1292(a)(2) or instead was governed exclusively by 28 U.S.C. § 158(d). *Memorial Estates,* 797 F.2d at 518-20. The Seventh Circuit then proceeded to decide whether a genuine equity receiver could ever be utilized in a bankruptcy case in light of 11 U.S.C. § 105(b) and whether appointment of one in that particular case was a proper use of equitable powers. *See id.* at 520-21; *see also* discussion in main text *infra.*

*Memorial Estates'* conclusion concerning why the district court had to enter the final receivership order hinged on its statement that "the foreclosure suit was collateral to the bankruptcy – a 'related' rather than 'core' bankruptcy [proceeding]." *Memorial Estates*, 797 F.2d at 518. One can readily understand where this conclusion came from, since a removed foreclosure suit obviously has a very, very strong state-law element (though, as mentioned earlier, that factor is not dispositive). Here, however, the underlying count in the civil action to which the receivership is ancillary is a fraudulent conveyance action brought by the Chapter 7 trustee under 11 U.S.C. § 544(b) and § 550(a), a cause of action already deemed a "core proceeding" consistent with the mandate of specific legal authority.

The Court will not treat the availability of an Illinois receivership as a noncore issue.

### D. The Availability of a Federal Preliminary Injunction to "Freeze" Assets Sought in an Civil Action at Law

Tekena USA's latest opposition to the TRO has focused on certain procedural aspects of Federal Rule of Civil Procedure 65. It was Tekena USA's initial written response on January 23, 2006, though, that raised a valid substantive issue that would block a preliminary injunction in this case. The substantive legal problem originates in the fact that at this point in time, the Chapter 7 trustee is an unsecured creditor without a fraudulent-transfer (or subsequent transferee) judgment against any of the eight defendants. As a result of the Supreme Court's holding in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund*, 527 U.S. 308, 326, 119 S.Ct. 1961, 1972 (1999), this Court may not use preliminary equitable relief under federal law – relief such as a TRO or preliminary injunction under Federal Rule of Civil Procedure 65 (Bankruptcy Rule 7065) – to "freeze" the assets of defendants pending resolution of a trial on the merits of a

21

nonjudgment creditor's "legal" claim. *Id.*, 119 S.Ct. at 1964, 1968-75. Although the Supreme

Court noted that a "'preliminary injunction is always appropriate to grant intermediate relief of

the same character as that which may be granted finally,'" *id.*, 527 U.S. at 326, 119 S.Ct. at 1972

(quoting and distinguishing *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 65

S.Ct. 1130 (1945)), it also made the following distinction:

> *Deckert* is not on point here because, as the Court took pains to explain, "the bill
> state[d] a cause [of action] for equitable relief." *Id.*, at 288, 61 S.Ct. 229. "The
> principal objects of the suit are rescission of the Savings Plan contracts and
> restitution of the consideration paid . . . . That a suit to rescind a contract induced
> by fraud and to recover the consideration paid may be maintained in equity, at
> least where there are circumstances making the legal remedy inadequate, is well
> established." *Id.*, at 289, 61 S.Ct. 229. The preliminary relief available in a suit
> seeking equitable relief has nothing to do with the preliminary relief available in a
> creditor's bill seeking equitable assistance in the collection of a legal debt.

*Id.*, 527 U.S. at 325, 119 S.Ct. at 1971 (emphasis added). The rule appears to be that a federal

court may use the federal common law of equity embodied in Federal Rule 65 to issue

preliminary equitable relief if 1) the count or claim at issue in the complaint asserts an equitable

claim and a right to a related equitable remedy and 2) the preliminary equitable relief sought is of

the same character as the final equitable relief sought in the count or claim at issue.[9] Actions to

---

[9]Incidentally, Illinois law has come to a similar conclusion in determining whether a court applying Illinois
equity jurisprudence may issue an injunction freezing or sequestering assets before an alleged unsecured creditor has
obtained a judgment, and it likewise noted the exception for legal claims containing an equitable aspect:

> The foregoing cases were cited with approval by Mr. Justice Magruder in *Detroit Copper & Brass
> Rolling Mills v. Ledwidge*, 162 Ill. 305, and in expressing the reason of the court in that case he
> said:
> "In all cases, where resort to equity has been allowed without first obtaining judgment, 'the claim
> of the complainant has had some equitable element in it,-- such as a trust, or the like.' * * * But we
> are unable to see that the claim set up in the case at bar has any equitable element in it, being an
> indebtedness for goods sold and delivered, and, therefore, a purely legal claim.
> . . . .
> The law seems to be that where the complainants' claim is a purely legal demand and has no
> equitable element in it the bill will not lie. In the instant case, complainants' claim is merely for
> commissions. It is true the complainants charge the defendants with a variety of fraud, but that

recover fraudulent transfers, even if based on a modern statute, are deemed actions at law.

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 37, 43-49, 109 S.Ct. 2782 (1989). In the instant

emergency motion for prejudgment relief and the corresponding motion to vacate such relief, we

are primarily dealing with Count I, a fraudulent transfer action. The only claim clearly sounding

in equity is the one requesting that all corporate veils be pierced with respect to Hamilton and

Kennett, *see, e.g., Fontana v. TLD Builders*, 840 N.E.2d 767,775-76 (Ill. App. Ct. 2005); *see*

*also International Financial Services Corp. v. Chromas Technologies Canada*, 356 F.3d 731,

735-38 (7th Cir. 2004) (same conclusion when Illinois substantive law viewed in light of federal

procedural law of jury trials), and even this type of equitable relief is different from the

preliminary equitable relief at issue here: issuance of a preliminary injunction "freezing" the

U.S. assets of Tekena USA pending resolution of the trial on the merits. A TRO or preliminary

injunction freezing the assets of any of the defendants is furthermore not available in this matter,

and the Court's order of February 21, 2006, effectively reflected this.

    As the Supreme Court noted in the same case, a federal court must instead look to state

prejudgment procedures and remedies under Federal Rule of Civil Procedure 64 (Bankruptcy

Rule 7064). *See Grupo Mexicano de Desarrollo S.A.*, 527 U.S. 308, 119 S.Ct. at 1973-74; *see*

*also In re Memorial Estates*, 797 F.2d 516, 519 (7th Cir. 1986).[10] In Illinois, two remedies

---

subject only becomes involved when it is determined what, if any, commissions may be due the
complainants.

*Pearson v. Tucson Farms Co.*, 204 Ill.App. 276, 1917 WL 1997, at *3 (Ill. App. Ct. 1917). As explained below,
however, other prejudgment remedies do exist in Illinois.

[10]Though *Memorial Estates* references a federal court's ability to utilize state-law prejudgment remedies
under Federal Rule of Civil Procedure 64 and to appoint a receiver under Federal Rule 66, only one of these rules,
Federal Rule 64, has a counterpart in the Federal Rules of Bankruptcy Procedure – Federal Rule of Bankruptcy
Procedure 7064.

paralleling the remedies the trustee has requested under federal law (an injunctive freeze of assets

and a Federal Rule 66 receivership) exist. The first is based on the attachment statute, 735 Ill.

Comp. Stat. 5/4-101 to -228 (2004), a remedy very conceptually similar to an injunction

"freezing" assets.[11] The second is based on the Illinois common law of equitable remedies,

which permits a prejudgment receiver to be appointed, though one discrete statutory section, 735

Ill. Comp. Stat. 5/2-415, does govern two narrow issues. Within limitations prescribed below,

these two remedies have either already supplanted or will be available to replace the prior TRO

this Court issued on January 23, 2006, and modified on January 24, 2006.

### E. The State Law Attachment Statute As a Prejudgment Remedy

The threshold requirements for application of the Illinois attachment statute are as follows:

> § 4-101. Cause. In any court having competent jurisdiction, a creditor having a
> money claim, whether liquidated or unliquidated, and whether sounding in
> contract or tort, or based upon a statutory cause of action created by law in favor
> of the People of the State of Illinois, or any agency of the State, may have an
> attachment against the property of his or her debtor, or that of any one or more of
> several debtors, either at the time of commencement of the action or thereafter,
> when the claim exceeds $20, in any one of the following cases:
> 1. Where the debtor is not a resident of this State.
> 2. When the debtor conceals himself or herself or stands in defiance of an officer,
> so that process cannot be served upon him or her.
> 3. Where the debtor has departed from this State with the intention of having his
> or her effects removed from this State.
> 4. Where the debtor is about to depart from this State with the intention of having
> his or her effects removed from this State.
> 5. Where the debtor is about to remove his or her property from this State to the
> injury of such creditor.
> 6. Where the debtor has within 2 years preceding the filing of the affidavit
> required, fraudulently conveyed or assigned his or her effects, or a part thereof, so
> as to hinder or delay his or her creditors.

---

[11]By contrast, equitable attachment cannot be maintained under Illinois equity jurisprudence. *See Pearson v. Tucson Farms Co.*, 204 Ill.App. 276, 1917 WL 1997, at *3 (Ill. App. Ct. 1917).

24

7. Where the debtor has, within 2 years prior to the filing of such affidavit, fraudulently concealed or disposed of his or her property so as to hinder or delay his or her creditors.

8. Where the debtor is about fraudulently to conceal, assign, or otherwise dispose of his or her property or effects, so as to hinder or delay his or her creditors.

. . . .

735 Ill. Comp. Stat. 5/4-101 (2004). The evidence presented at the January 23, 2006, evidentiary hearing on the emergency motion implicated three of the eight defendants in the following ways. Cause number one implicates defendants Hamilton and Kennett, as they are not residents of Illinois. Causes number six and seven implicate defendant Teknek America/Kenham LLC, and if the corporate veils of the debtor and Teknek America/Kenham LLC are pierced, then they also implicate Kennett and Hamilton. As detailed above, Kennett and Hamilton appear to have orchestrated a series of transfers of the Chapter 7 debtor's assets which either 1) passed through Teknek America/Kenham, LLC and landed in defendant Tekena USA's lap or 2) passed to bank accounts Kennett and Hamilton control. Defendant Kenham, LLC engaged in a final transfer to defendant Tekena USA that may have been for less than reasonably equivalent value if actual revenue before and after the transfer is taken into account. What is crucial under the Illinois statute is that the particular defendant have engaged in the transfer, disposal, or concealment (causes number six and seven) or be in the process of committing such conduct (causes number five and eight); it is not addressed to defendants who have merely received and may currently be holding a fraudulent transfer. While they may ultimately be liable for a money judgment under 11 U.S.C. § 550, the latter are not subject to prejudgment attachment. The evidence presented thus far tends to indicate that Tekena USA may have received a fraudulent transfer, but it did not indicate (and the receiver has not thus far reported) that Tekena's assets are about to be

transferred out of Illinois for less than reasonably equivalent value.

At this point in time then, defendants Rollinson, Sandilands, Guttierez, Wilberg, and

Tekena USA are not susceptible to prejudgment attachment as a viable substitute for "freezing"

assets under the federal law of equity. Based on the evidence in the record from January 23,

2006, defendants Hamilton, Kennett, and Teknek America/Kenham LLC appear to be vulnerable

to prejudgment attachment. However, a plaintiff must first comply with the state statute's

affidavit requirements, 5/4-104 to -105; mandatory bonding, 5/4-107 to -109; and service

requirements after entry of a court order of attachment, 5/4-112 to -114 & -127.[12]

### F. State Law Equity Receivers As a Prejudgment Remedy in Bankruptcy

Bankruptcy courts do not have general authority under Federal Rule of Civil Procedure 66

to appoint receivers pursuant to federal law; no Federal Rule of Bankruptcy Procedure 7066

exists. Rather, in bankruptcy cases, the U.S. trustee, standing trustees, case trustees, and debtors-

in-possession oversee the administration of bankruptcy estates for the collective benefit of

creditors, as directed by statute. Bankruptcy receivers, as opposed to equity receivers, would

leave trustees and debtors-in-possession with no bankruptcy estates to administer. Furthermore,

the Bankruptcy Code provides that "a court may not appoint a receiver in a *case* under this title."

11 U.S.C. § 105(b) (emphasis added). However, in certain civil proceedings, such as this one,

---

[12]Among other things, the affidavit must state the amount of the claim, facts sufficient to maintain at least
one valid cause of action, and facts establishing at least one cause justifying prejudgment attachment. 735 Ill. Comp.
Stat. 5/4-104 (2004). The court may then need to determine whether a cause of action has been stated, and if it states
a "tort," the court must set the amount of damages at a hearing. *See id.* The amount of the "claim" in this instance is
the aggregate relief sought under Counts one through five of the bankruptcy trustees complaint, not SDI's $3.7
million patent-infringment judgment.
    A bond for twice the amount of the claim is required by law, *Witters v. Hicks*, 780 N.E.2d 713, 722 (Ill.
App. Ct. 2002), unless the plaintiff chooses to attach specific property that does not oversecure the claim, in which
case the bond may be for twice the amount of the value of the specific property. *See* 5/4-107, -108, & -110.

within a bankruptcy case wherein the defendant is not the debtor or the trustee, Federal Rule of

Bankruptcy Procedure 7064 and 11 U.S.C. § 105(a) permit a bankruptcy court to award a plaintiff

whatever prejudgment remedies are available in the relevant state. *See* 10 *Collier On Bankruptcy* ¶

7064.01 – .02, at 7064-1 to -3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005); *see*

*also In re Memorial Estates*, 797 F.2d 516, 519-20 (7th Cir. 1986); *cf. In re Schlein*, 178 B.R. 82,

(Bankr. E.D. Pa. 1995) (using only § 105(a)).[13]  "The power cut off by section 105(b) of the

Bankruptcy Code is the power to appoint a receiver for the bankrupt estate, that is, a receiver in

lieu of a trustee." *In re Memorial Estates*, 797 F.2d 516, 520 (7th Cir. 1986).  If both entities do

exist in the same bankruptcy "case," a conflict would not normally exist between the equity

receiver and the bankruptcy trustee unless the assets placed in receivership and the assets of the

bankruptcy estate defined in 11 U.S.C. § 541 overlap.  Even then a conflict might not exist, as a

receiver often runs and preserves a business for ultimate disposition in a civil suit, while the

Chapter 7 trustee's primary duty would be to liquidate the estate. *See id.* at 520.  In other

instances the bankruptcy court's appointment of a receiver may be an abuse of discretion if the

assets placed in a receivership are the main assets of the estate, and the appointment effectively

"emasculates" the "trustee's role." *Id.* at 520.  Otherwise, use of an equity receiver is permissible

in a bankruptcy case if it does not interfere with or hold property overlapping the bankruptcy

estate prior to entry of an avoidance judgment in the civil action in which the receiver is serving.

Here, the proposed object of the receivership, Tekena USA, and at least the bulk of its assets are

not currently property of Chapter 7 debtor Teknek LLC's bankruptcy estate; it is a separate entity

---

[13]While *Schlein's* use of § 105(a) alone is not obviously incorrect, using that section in conjunction with other more specific authority is preferable if such authority exists.

with different ownership. Interference with Chapter 7 administration by the bankruptcy trustee is not an issue.

### 1. Illinois Equity Receivers

Prejudgment receiverships are available under Illinois law. *See generally* 31A Illinois Law and Practice, *Receivers* (West 1996 & Supp. 2005). An Illinois court of equity has chancery jurisdiction to appoint receivers *pendente lite* in the absence of a statute providing otherwise.[14] *Witters v. Hicks*, 780 N.E.2d 713, 722 (Ill. App. Ct. 2002); *Hurst v. Papierz*, 306 N.E.2d 532, 538 (Ill. App. Ct. 1973); *Compton v. Paul K. Harding Realty Co.*, 285 N.E.2d 574, 580 (Ill. App. Ct. 1972); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *3-*4 (Ill. App. Ct. 1903); *Chicago Title & Trust Co. v. Goldman*, 272 Ill.App. 457, 1933 WL 2689, at *4-*7 (Ill. App. Ct. 1933). This power permits the court, while adjudicating a civil action in which other ultimate relief is sought, to take possession of the property that is the subject of the civil action. *Hurst v. Papierz*, 306 N.E.2d 532, 538 (Ill. App. Ct. 1973); *Heritage Pullman Bank v. American Nat. Bank and Trust Co. of Chicago*, 518 N.E.2d 231, 234, 236 (Ill. App. Ct. 1987); *Van Ness v. Arado*, 257 Ill.App. 56, 1930 WL 3060, at *2 (Ill. App. Ct. 1930); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *3-*4 (Ill. App. Ct. 1903). As an officer, agent, and fiduciary of the court,[15] the Illinois equity receiver is appointed as a court agent to administer property for the benefit of all parties so that the property might be preserved for the party ultimately entitled thereto in the pending, primary civil proceeding. *Evans v. Illinois Surety Co.*, 149 N.E. 802, 804 (Ill.1925);

---

[14]Unlike the various common-law requirements and characteristics of receiverships, the bonding provisions pertaining to the applicant are governed by a single statutory provision, 735 Ill. Comp. Stat. 5/2-415 (2004).

[15]*See Powell v. Voight*, 181 N.E. 403, 404 (Ill. 1932); *First Nat. Bank of Vandalia v. Trail Ridge Farm*, 492 N.E.2d 1030, 1035 (Ill. App. Ct. 1986); *City of Chicago v. Hart Bldg. Corp.*, 253 N.E.2d 496, 502 (Ill. App. Ct. 1969); *Witters v. Hicks*, 780 N.E.2d 713, 722 (Ill. App. Ct. 2002).

*People ex rel. Scott v. Pintozzi*, 277 N.E.2d 844, 849 (Ill. 1971); *Chicago Title & Trust Co. v.*

*Goldman*, 272 Ill.App. 457, 1933 WL 2689, at *5 (Ill. App. Ct. 1933); *Kulwin v. Harsh*, 232

Ill.App. 419, 1924 WL 3503, at *4 – *5  (Ill. App. Ct. 1924); *Chicago Title & Trust Co. v.*

*Chapman*, 132 Ill.App. 55, 1907 WL 1679, at *4 (Ill. App. Ct. 1907); *People, for Use of*

*Commercial Nat. Bank & Trust Co. of Peoria v. Furey*, 29 N.E.2d 612, 615 (Ill. App. Ct. 1940);

*Knickerbocker v. McKindley Coal & Mining Co.*, 67 Ill.App. 291, 1896 WL 2729, at *3 (Ill. App.

Ct. 1896), *affirmed*, 50 N.E. 330 (Ill. 1898).  The Appellate Court of Illinois summarized these

principles as follows:

> A receiver is defined to be an indifferent person between the parties, appointed by
> the court, and on behalf of all parties, and not of the complainant or one defendant
> only, to receive the thing or property in litigation, pending the suit. *Baker v.*
> *Administrator of Backus*, 32 Ill. 79. The appointment of a receiver is a branch of
> equity jurisdiction not dependent upon any statute, and rests largely in the
> discretion of the appointing court. It had its origin in the English Court of Chancery
> at an early date, and it was incidental to and in aid of the jurisdiction of equity to
> enable it to accomplish, as far as practicable, complete justice among the parties
> before it, the object being to secure and preserve the property or thing in
> controversy for the benefit of all concerned pending the litigation, so that it might
> be subjected to such order or decree as the court might make or render. *Chicago*
> *Title and Trust Co. v. Mack*, 347 Ill. 480, 180 N.E. 412.

*Compton v. Paul K. Harding Realty Co.*, 6 Ill.App.3d 488, 497-98, 285 N.E.2d 574, 580 (Ill. App.

Ct. 1972).  Thus, the receiver, as an extension of the court, should normally be a neutral, impartial

entity not otherwise interested in the main litigation as a party or creditor, *Union Trust & Savings*

*Bank v. Hamilton*, 283 F. 56, 57 (7th Cir. 1922); *Watson v. Cudney*, 144 Ill.App. 624, 1908 WL

2138, at *3 (Ill. App. Ct. 1908), and thus would not be considered adverse to either party, *In re*

*Burgh*, 7 F.Supp. 184, 187 (N.D. Ill. 1933).  Similarly, the receiver should not employ an attorney

with an adverse personal or representative interest against any of the parties to the primary suit.

*Heffron v. Flower, Remy & Holstein*, 35 Ill.App. 200, 1889 WL 2555, at *3-*4 (Ill. App. Ct. 1889). The receiver holds possession for the court subject to all previously existing equities, legal interests, and liens on the property. *Western Powder Mfg. Co. v. Interstate Coal Co.*, 13 F.Supp. 77, 82 (E.D. Ill. 1936); *Gillam v. Nussbaum*, 95 Ill.App. 277, 1900 WL 3823, at *2 (Ill. App. Ct. 1901). Ordinarily the liability for receiver compensation and legal expenses lies upon the receivership estate being administered, including the income and the *res*, and constitutes a charge upon such property if unsatisfied. *City of Chicago v. Kideys*, 617 N.E.2d 162, 165-66 (Ill. App. Ct. 1993); *Rosenblatt v. Michigan Ave. Nat. Bank*, 389 N.E.2d 182, 187 (Ill. App. Ct. 1979); *Knickerbocker v. McKindley Coal & Mining Co.*, 67 Ill.App. 291, 1896 WL 2729, at *3 (Ill. App. Ct. 1896), *affirmed*, 50 N.E. 330 (Ill. 1898). If the estate is unable to bear such expenses, the parties for whose benefit the receivership was created are liable. *Knickerbocker*, 67 Ill.App. 291, 1896 WL 2729, at *3. In this instance, the primary creditor of the bankruptcy estate, SDI, has agreed to pay the fees and expenses of the receivership. Although the Chapter 7 trustee is the party benefitted in this civil proceeding, SDI has a stake – and very likely the only stake – in the outcome and is represented by the Chapter 7 trustee. Due to the single-noninsider-creditor status of the estate, a virtual identity of interests between the trustee and the creditors exists. Furthermore, SDI's undertaking of financial responsibility is not necessarily inconsistent with established law. However, the Court wishes to clarify that by paying the fees and expenses of the receivership, SDI is not entitled to control and direct it. Rather, the receiver is a neutral overseer appointed as an agent of this Bankruptcy Court and subject only to this Court's orders, as set forth in the law cited above.

Provided the receiver follows court orders, he may only be sued and held liable in his

official receiver capacity; this proceeding is similar to an *in rem* proceeding in which judgments may be exclusively collected in the course of the administration of estate property.[16] *First Nat. Bank of Vandalia v. Trail Ridge Farm*, 492 N.E.2d 1030, 1035 (Ill. App. Ct. 1986); *Goff v. Will County Nat. Bldg. Corp.*, 35 N.E.2d 718, 720 (Ill. App. Ct. 1941); *Lyons v. Sampsell*, 168 Ill.App. 542, 1912 WL 2082, at *1 (Ill. App. Ct. 1912); *Kloepher v. Osborne*, 177 Ill.App. 384, 1913 WL 2038, at *6 (Ill. App. Ct. 1913); *Niemi v. Sprague*, 8 N.E.2d 707, 713 (Ill. App. Ct. 1937); *Belke v. Bush*, 213 Ill.App. 29, 1918 WL 2095, at *2 (Ill. App. Ct. 1918). Official capacity suits against a receivership must be maintained in the court creating the receivership, but they may be initiated without leave of such court. *See* 735 Ill. Comp. Stat. 5/2-415(c) (2004).

2. Legal Standards for Appointment of an Illinois Equity Receiver

Generally the appointment of a receiver for a particular piece of property requires that the defendant hold possession of the property at issue in the main civil action. *First Nat. Bank v. Gage*, 79 Ill. 207, 1875 WL 8598, at *1 (Ill. 1875); *Hetzel v. Fadner*, 162 Ill.App. 639, 1911 WL 2571, at *3 (Ill. App. Ct. 1911); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *4 (Ill. App. Ct. 1903). "[A] receivership is a remedy to be applied by a Court whenever, in its judgment and discretion, the exercise of such power is necessary to prevent injury and to do complete justice." *Simpson v. Adkins*, 37 N.E.2d 355, 358 (Ill. App. Ct. 1941). As receiverships are considered extraordinary and harsh equitable remedies, compelling circumstances and great caution are required. *Bagdonas v. Liberty Land & Investment Co.*, 140 N.E. 49, 52 (Ill. 1923);

---

[16]The limited exceptions of *in personam* liability have been for breach of fiduciary duty to the receivership estate and for torts such as trespass and conversion that the receiver personally commits without a supporting, valid court order. *Federal Sav. and Loan Ins. Corp. v. PSI Realty Co.*, 630 F.2d 515, 521 (7th Cir. 1980); *Hetzel v. Fadner*, 162 Ill.App. 639, 1911 WL 2571, at *3-*4 (Ill. App. Ct. 1911).

*Prassas v. Nicholas W. Prassas & Co.*, 430 N.E.2d 28, 30 (Ill. App. Ct. 1981); *Hurst v. Papierz*,

306 N.E.2d 532, 538 (Ill. App. Ct. 1973); *Simpson v. Adkins*, 37 N.E.2d 355, 358 (Ill. App. Ct.

1941); *cf. Pearson v. Tucson Farms Co.*, 204 Ill.App. 276, 1917 WL 1997, at *3 (Ill. App. Ct.

1917) (noting that the exception permitting a nonjudgment creditor to obtain appointment of a

receiver requires an "exceptional equity"); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319,

at *4 (Ill. App. Ct. 1903) (noting that "the general rule [is] that conflicting questions of title

should be determined in courts of law").  The stringent standard is a result of the fact that

appointment is in derogation of the fundamental property right of a legal owner to possession.

*Bagdonas v. Liberty Land & Investment Co.*, 140 N.E. 49, 52 (Ill. 1923); *Kennedy v. Miller*, 528

N.E.2d 406, 408 (Ill. App. Ct. 1988); *Prassas v. Nicholas W. Prassas & Co.*, 430 N.E.2d 28, 30

(Ill. App. Ct. 1981).  Because conditions supporting a receivership must exist at the time of

appointment, past conduct and circumstances relied upon must create an inference that such

information is currently true and will continue to be so in the future.  *Jackson v. Metropolitan

Funeral System Ass'n*, 268 Ill.App. 302, 1932 WL 2645, at *4 (Ill. App. Ct. 1932).  The particular

substantive requirements for instituting an equity receivership can be broken down into three

categories.

 First, other remedies, including remedies at law and injunctions, must be inadequate

means for accomplishing the object of the receivership. *Fox v. Fox Valley Trotting Club*, 110

N.E.2d 84, 86 (Ill. App. Ct. 1953); *Citicorp Sav. of Illinois, F.A. v. Occhipinti*, 483 N.E.2d 706,

711 (Ill. App. Ct. 1985); *Prassas v. Nicholas W. Prassas & Co.*, 430 N.E.2d 28, 30 (Ill. App. Ct.

1981); *Schack v. McKey*, 97 Ill.App. 460, 1901 WL 2075, at *3 (Ill. App. Ct. 1901).  This object

is usually "to prevent fraud, save the subject of litigation from material injury, or rescue it from

32

threatened destruction," loss, waste, or misconduct. *Compton v. Paul K. Harding Realty Co.*, 285

N.E.2d 574, 580 (Ill. App. Ct. 1972); *see Bagdonas v. Liberty Land & Investment Co.*, 140 N.E.

49, 52 (Ill. 1923); *Chicago Title & Trust Co. v. Chapman*, 132 Ill.App. 55, 1907 WL 1679, at *4

(Ill. App. Ct. 1907); *Leib v. Toulin*, 447 N.E.2d 900, 907-08 (Ill. App. Ct. 1983); *Kennedy v.

Miller*, 528 N.E.2d 406, 408-09 (Ill. App. Ct. 1988); *Prassas v. Nicholas W. Prassas & Co.*, 430

N.E.2d 28, 30 (Ill. App. Ct. 1981); *Steinwart v. Susman*, 238 N.E.2d 200, 203 (Ill. App. Ct. 1968);

*Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *3-*4 (Ill. App. Ct. 1903). Specifically,

this object of preventing imminent irreparable injury, dissipation, or loss of property is present in

situations when the property at issue has already been transferred by means of factually and

constructively fraudulent transfers and is in danger of being similarly transferred in the future.

*See Hurst v. Papierz*, 306 N.E.2d 532, 536-38 (Ill. App. Ct. 1973). And, quite significantly, such

irreparable harm and loss of property may be demonstrated in the actually-fraudulent-transfer

scenarios by showing "a danger . . . that the property . . . may be placed beyond the jurisdiction of

the court or in some way involved in transfers, conveyances or subjected to other claims, so as to

render it more difficult for the court to give and enforce final relief." *Hurst v. Papierz*, 306

N.E.2d 532, 538 (Ill. App. Ct. 1973); *see also Schack v. McKey*, 97 Ill.App. 460, 1901 WL 2075,

at *3 (Ill. App. Ct. 1901); *Prassas v. Nicholas W. Prassas & Co.*, 430 N.E.2d 28, 30 (Ill. App. Ct.

1981). In other words, the prevention of fraud justifying appointment of a receiver includes the

prevention of fraudulent transfers that are potentially ongoing.

    Second, a reasonable probability that the plaintiff/applicant will prevail on the underlying

merits must exist. *Fox v. Fox Valley Trotting Club*, 110 N.E.2d 84, 86 (Ill. App. Ct. 1953);

*Simpson v. Adkins*, 37 N.E.2d 355, 358 (Ill. App. Ct. 1941); *Ruprecht v. Henrici*, 113 Ill.App. 398,

33

1904 WL 1667, at *2-*3 (Ill. App. Ct. 1904); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *3-*4 (Ill. App. Ct. 1903).

Third, the plaintiff must have (1) a lien on the receivership property, (2) a clear right to such property, or (3) a way of showing that the property constitutes a "special fund" from which its claim may be satisfied under the governing substantive law. *Bagdonas v. Liberty Land & Investment Co.*, 140 N.E. 49, 52 (Ill. 1923); *W.E. Erickson Const. v. Congress-Kenilworth Corp.*, 445 N.E.2d 1209, 1212 (Ill. App. Ct. 1983); *Steinwart v. Susman*, 238 N.E.2d 200, 203 (Ill. App. Ct. 1968); *Simpson v. Adkins*, 37 N.E.2d 355, 358 (Ill. App. Ct. 1941); *Lemker v. Kalberlah*, 105 Ill.App. 445, 1903 WL 1319, at *3-*4 (Ill. App. Ct. 1903). An unsecured creditor without a judgment may obtain a receivership, but, as the exception to the above rule, he must show an "exceptional equity" in his favor. *Pearson v. Tucson Farms Co.*, 204 Ill.App. 276, 1917 WL 1997, at *3 (Ill. App. Ct. 1917).

3. Legal Standards for Appointment of an Illinois Equity Receiver as Applied to Tekena USA

Tekena USA's primary contention in the motion to vacate is that the Court erred in determining whether an Illinois equity receivership is appropriate on the record presented in this adversary proceeding. The five defendants associated with Tekena USA appeared by attorney and opposed the requested extraordinary relief, claiming that those five are not responsible for the conduct of transferor companies controlled by Hamilton and Kennett; since Tekena USA purchased assets from the parent company for $38,500, it is an independent distributorship not owned or controlled by Kennett or Hamilton.

Applying the above substantive requirements to the facts of this case, the Court finds other conceivable remedies inadequate. The Court has already discussed how a preliminary injunction

34

freezing assets is not available at all in this matter because of its legal nature. It further discussed

how prejudgment attachment under the Illinois statutes is not available with respect to the

particular defendant who is the present repository of the assets at issue, Tekena USA, because it is

an independent transferee rather than a transferor. We have further seen how both the Chapter 7

case and this adversary proceeding have probably stemmed from a series of actually and

constructively fraudulent conveyances, with the ultimate transferees of such conveyances being

both defendants Kennett and Hamilton and defendant Tekena USA. As set forth above, the

halting of what appear to be ongoing fraudulent conveyances is a substantial situation to which

appointment of an Illinois equity receiver may be addressed, particularly when those conveyances

may place assets needed for recovery in the main civil litigation beyond the court's jurisdiction.

In this case, a couple of characteristics distinguish the present fraudulent-transfer adversary

proceeding from a more typical one in which the money or avoidance judgment under § 550(a)

would prove to be an adequate remedy at law.

First, since 2003, Teknek entities owned and controlled by Kennett and Hamilton have

engaged in multiple strategic responses to multiple adverse federal court rulings for the purpose of

preventing the Chapter 7 debtor Teknek LLC from paying a patent-infringement judgment. As the

patent-infringement verdict was looming near in July 2004, the debtor Teknek LLC simply closed

shop a month in advance and reopened a few blocks away with a slightly different name but no

other legally significant changes. To justify the transfer of money to Kennett and Hamilton and to

Teknek Electronics in Scotland and away from creditor SDI, Kennett and Hamilton recorded

questionable loans to the Chapter 7 debtor in addition to utilizing questionable intercompany

service agreements for which services of unknown market value and benefit to the debtor resulted

35

in fees paid to various affiliated Teknek entities. Then, after creditor SDI registered the judgment

for collection in Illinois on March 25, 2005, and after U.S. District Court Judge Shadur enjoined

Teknek America/Kenham LLC from continuing U.S. business operations as a civil-contempt

remedy, Kennett and Hamilton 1) had the four employees form Tekena USA during June 2005; 2)

interrupted the contempt proceeding by having the debtor Teknek LLC file a Chapter 7 case to

distribute a mere $73.22 during July 2005; and 3) had Tekena USA formally grab the debtor's

baton during September 2005 for a modest $38,500 once Teknek America/Kenham LLC was free

from Judge Shadur's contempt injunction. It is difficult to imagine why these continued strategic

responses to adverse federal court rulings would abate anytime in the near future, given Kennett

and Hamilton's track record. With respect to the receivership defendant Tekena USA, it is also

difficult to imagine why they would hesitate to use one of the other Teknek entities to overcharge

Tekena USA on a sublease, an intercompany service agreement, or an inventory sale as a means to

funnel profits derived from what was once the Chapter 7 debtor's goodwill overseas. Based on

the track record of Kennett and Hamilton's companies and their relationship with defendant

Tekena USA as 1) a business transferor and license holder, 2) a sublessor, and 3) a wholesale

seller, some type of monitoring is in order. Fraudulently transferred property itself is generally

recoverable from subsequent transferees under § 550(a); the bankruptcy court is not bound to

entering only money judgments. *See* 11 U.S.C. § 550(a) ("the trustee may recover . . . the

property transferred, or, if the court so orders, the value of such property"). So far, adverse court

rulings have caused at least two sweeping business-asset transfers avoiding payment on the

Chapter 7 debtor's debt for patent infringement. A third or fourth set of transfers in the present

scenario could render the job of applying § 550 unmanageable, as the assets continue to be split

36

more broadly under increasingly sophisticated schemes. An Illinois receivership in this case guards against future transfers of numerous types of assets that could be split apart among multiple "Teknek" entities overseas.

A second major consideration must factor into a decision on whether likely irreparable harm due to inadequacy of legal remedies has been shown. In the case at bar, the nature of the assets available for judgment satisfaction under § 544(b) and § 550(a) of the Code makes normal postjudgment monitoring, tracking, and recovery difficult. The defendant Tekena USA's distributorship license, which is terminable on 30 days' notice, belongs to Teknek Holdings in Scotland and is thus controlled by its shareholders, defendants Kennett and Hamilton. A source of future recovery would be the future profits derived from Tekena's use of this license and its associated trade name (Teknek America) and customer lists – intangible assets which essentially carry the goodwill and the going-concern value of the debtor herein, Teknek LLC. These assets – while obviously valuable right now, having produced annual streams of gross revenue worth $4 million, and potentially valuable as future sources of legal recovery – are intangible and highly ephemeral. Should defendants Kennett and Hamilton decide to terminate the license in response to adverse federal court rulings, they could cause business assets such as the earning power and goodwill formerly ascribed to the Chapter 7 debtor to dry up and/or return to the United Kingdom before the Chapter 7 trustee could collect a fraudulent transfer judgment under 11 U.S.C. § 544(b). Additionally, cash and funds in bank accounts are slippery and easily transferred, hidden, and/or commingled; overseas transfers of money would be particularly quick and effective. Once the assets become centered, located, or controlled in the United Kingdom, they would become uncollectible without additional legal proceedings in a foreign court system. The legal remedies

37

in this country, either state or federal, would therefore be inadequate. The only assets remaining

for judgment satisfaction would be a lease of real property and personal property consisting of

office equipment, both of dubious value when compared to estate claims. Possibly some

inventory of unknown value would remain, though a nonparty "Teknek" entity in Scotland has

enormous *de facto* control over the supply of inventory in this country, as noted above. For these

two stated reasons, then, the trustee/plaintiff has inadequate legal remedies and alternative

equitable remedies, leaving significant potential for irreparable harm to the estate.

With respect to a reasonable probability that the plaintiff/applicant will prevail on the

merits, an important Bankruptcy Code distinction must be delineated. The Court has previously

set forth how the debtor's members probably caused it to engage in actually and constructively

fraudulent transfers avoidable under § 544(b); these transfers left many of the debtor's business

assets in the hands of defendant Teknek America/Kenham LLC and vulnerable under § 550(a).

Given that the same LLC members governed the subsequent transfer of the same business assets

from Teknek America/Kenham LLC to Tekena USA under similar (though not identical)

conditions, the transferor's subjective intent behind this final transaction was probably not

different in any legally significant way. Furthermore, the Court has already found a probability of

success on the merits of the § 544(b) and § 550(a) claims with respect to defendants Hamilton,

Kennett, and Teknek America/Kenham LLC.[17]

The trustee requests that the receivership nevertheless be imposed upon defendant Tekena

USA, although Tekena raises two objections: 1) it purchased most of Teknek America/Kenham

---

[17]See also and compare the previous section on the Illinois attachment statute as applied to Kennett,
Hamilton, and Teknek America/Kenham LLC.

LLC's assets, save for the accounts receivable, for $38,500, and 2) its shareholders are not

Kennett and Hamilton (as would be required for a finding of successor liability) but are four

former employees of the debtor Teknek LLC and defendant Teknek America who had neither

ownership nor management control over either previous Teknek entity. However, Tekena USA is

not a defendant under Count I because of its initiation and transfer of assets; it is a defendant

under Count I because it is a "mediate transferee" which ultimately *received* assets that in all

probability had been actually and constructively transferred fraudulently. "The particular theory

under which a transfer has been avoided is, for all intents and purposes, irrelevant to the liability

of the transferee from whom the trustee seeks to recover the property. Section 550 of the Code

enumerates those entities from whom recovery can be had."[18] *In re Hooker Investments*, 155 B.R.

332, 337 (Bankr. S.D.N.Y. 1993) (citation omitted). Section 550 of Title 11 provides in pertinent

part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if the
> court so orders, the value of such property, from--
> (1) the initial transferee of such transfer or the entity for whose benefit such
> transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.
> (b) The trustee may not recover under section (a)(2) of this section from--
> (1) a transferee that takes for value, including satisfaction or securing of a present
> or antecedent debt, in good faith, and without knowledge of the voidability of the
> transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.
> . . .
> (d) The trustee is entitled to only a single satisfaction under subsection (a) of this

---

[18]Perhaps this principle would be clearer if one count had named the initial-transferee defendants in the line
of succession using § 544(b) and the Illinois Uniform Fraudulent Transfer Act, and then another count had named
Tekena USA and the other defendants using § 550. However, when viewed in light of the specific allegations, the
evidence presented at preliminary hearings, and existing law, the plaintiff's complaint contemplated this type of
conceptual organization, even if not formally delineated.

section.

(c)(1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of--

(A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and

(B) any increase in the value of such property as a result of such improvement, of the property transferred.

. . . .

11 U.S.C. § 550. Should Tekena USA, a "mediate transferee" in this instance, interpose the complete affirmative defense under subsection (b)(1), it would be required to prove both that it provided value in exchange for the transfer and that it received it in good faith and without knowledge of the voidability of the transfer being avoided. Regarding the latter elements of the affirmative defense, the evidence at this preliminary stage is sufficient for drawing two inferences based on the fact that the four shareholders of defendant Tekena USA were employees of both the Chapter 7 debtor herein, Teknek LLC, and defendant Teknek America/Kenham LLC: 1) they had knowledge of SDI's $3.7 million judgment against the debtor, and 2) they were aware that while the intellectual-property dispute was brewing and debt collection commencing, the basic American "Teknek" operation was shifting from the first entity to the second one and then again to the third one (owned by them). Thus, a heavy cloud hangs over Tekena USA's affirmative defense under § 550(b)(1), even if it proves that it took the transfer for value, and the Court finds that the trustee has a probability of success on the merits specifically against defendant Tekena USA on Count I of the adversary complaint. The argument based on lack of successor liability under nonbankruptcy law is irrelevant here, and the one based on the payment of $38,500 is insufficient under applicable law.

Finally, the plaintiff must set forth a lien on the receivership property, a clear right to such

property, or a way of showing that the property constitutes a "special fund." *See supra.* On first

blush, the same problem posed by a preliminary injunction "freezing" assets is posed here: the

plaintiff herein, the Chapter 7 bankruptcy trustee, is an alleged unsecured creditor of the eight

defendants without a judgment, and right now Tekena USA, Teknek Holdings in Scotland, and

Teknek America/Kenham LLC hold formal legal title to most of the business assets and funds in

controversy. Nevertheless, the unique nature of bankruptcy law and, specifically, of 11 U.S.C. §

550(a) permits the plaintiff/trustee to meet the "special fund" requirement under Illinois law. As

stated above, once the trustee has avoided a transfer, he is not bound to accept satisfaction in the

form of money judgments against the "mediate transferees"; the statute explicitly grants the

trustee the right and the power to recover the actual property illegally transferred and bring the

same into the debtor's bankruptcy estate for the benefit of creditors. Because the Court has

already found a probability of success on the merits of the § 544(b) and § 550(a) claims against

the two American "Teknek" entities, the business assets Tekena USA holds are themselves

vulnerable to being brought back into the bankruptcy estate to pay creditors. The "special fund"

requirement under Illinois equity jurisprudence is satisfied by the unique legal rights that § 550(a)

of the Bankruptcy Code creates.

Tekena USA's response complains that the adversary complaint is not sufficiently specific

in its averments of fraud, i.e., that it does not allege which assets of the Debtor were transferred to

which Defendants. This point is not convincing. The Defendants are alleged to have collectively

over time shifted the judgment debtor's assets first to Teknek America/Kenham LLC and then to

Tekena USA. The gravamen of the adversary complaint is not just that specific assets were

misappropriated but that the entire business, including the goodwill and going-concern value, was

improperly transferred on several occasions.

This Court has exercised great caution in the appointment of a receiver and does so for the

forgoing reasons viewed in light of the Court being told at the original hearing that if a receiver is

appointed, some of the defendants might set up another company . . . the very behavior of which

Plaintiff complains. This caution is expressed by calling attention to the following legal principle:

As officers of the court, receivers have only those powers and duties conferred on them by the

appointing court. *Witters v. Hicks*, 780 N.E.2d 713, 722 (Ill. App. Ct. 2002); *Powell v. Voight*,

181 N.E. 403, 404 (Ill. 1932); *Strong v. Friedman*, 1931 WL 3033, *6 (Ill. App. Ct. 1931);

*Chicago Title & Trust Co. v. Goldman*, 272 Ill.App. 457, 1933 WL 2689, at *5 (Ill. App. Ct.

1933). The receiver may make expenditures for employee labor and otherwise, to be charged to

the receivership estate, so long as they are reasonable and beneficial to the receivership estate.

259 ill app 239. The Court in this case has not ordered the receiver to take possession and

management control of the defendant's business operation but instead has instituted a limited

receivership with oversight, auditing, and clearance authority described further in the related

order. Thus, in the specifics of the nonpossessory receivership fashioned, the Court has already

attempted to preserve any legitimate interests these five defendants may ultimately have at the

conclusion of the litigation. The receivership should preserve value for whomever is ultimately

entitled to it.

For the foregoing reasons, the portion of the motion requesting an order vacating the

appointment of a receiver for Tekena USA is denied.

Dated:  April 6, 2006                    ENTERED:            *Jacqueline P. Cox*

                                                    J.Cox
                                         _____
                                         Jacqueline P. Cox
                                         United States Bankruptcy Judge